IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLIE T. HEARD,<br>    Plaintiff,<br><br>vs.<br><br>THE WAYNESBURG UNIVERSITY,<br>f/k/a THE WAYNESBURG COLLEGE,<br>    Defendant. | Civil Action No. 09-1315 |

## MEMORANDUM OPINION

Plaintiff, Charlie T. Heard, brings this action against Defendant, The Waynesburg University, f/k/a The Waynesburg College, alleging claims of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII); 42 U.S.C. § 1981; and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA), arising out of Waynesburg's termination of his employment as a part-time wrestling coach on January 31, 2008.

Currently pending before the Court for disposition is a motion for summary judgment, filed by Defendant. For the reasons that follow, the motion will be granted.

Facts

In early 2006, Waynesburg advertised that it was seeking applicants for its part-time head wrestling coach position for the 2007 season. (Heard Dep. at 72-73 & Ex. 1.)[1] In response, on February 24, 2006, Plaintiff sent a cover letter and resume to Waynesburg, expressing his interest in the position. (Heard Dep. at 73-75 & Exs. 2, 3, 4.) On March 2, 2006, Waynesburg responded to Plaintiff's letter and resume by sending a letter to him acknowledging receipt of the same and

---

[1] Def.'s App. (ECF No. 43) Tab A.

asking him to complete a Staff Application. (Heard Dep. at 75 & Ex. 5.)

Plaintiff completed the application and was invited to interview for the position with Waynesburg's athletic director, Rudy Marisa. (Heard Dep. at 75-77 & Ex. 6.) Marisa interviewed Plaintiff and remarked that he was impressed with his resume. He informed Plaintiff that the position was part-time, earning $7,500.00 per year and that he would need to interview with Richard L. "Skip" Noftzger, Waynesburg's Vice President of Student Affairs, because Marisa and Noftzger would make the decision. (Heard Dep. at 77-79, 83.) Plaintiff then interviewed with Noftzger and they discussed, among other things, the amount of pay offered and the fact that Plaintiff had a part-time catering business and also performed private wrestling teaching. (Heard Dep. at 83-85.)

Following his interview with Noftzger, Plaintiff met again with Marisa in his office and was offered the position of part-time head wrestling coach at a salary of $7,500.00. (Heard Dep. at 88-89 & Ex. 7.) He accepted the offer and signed a "Part-Time Term Contract Administrative Staff Agreement" with Waynesburg to be its part-time head wrestling coach. (Heard Dep. at 88-90 & Ex. 7.) This job represented the first time he held a paid position coaching wrestling for a university and the first time he coached at the Division III level. (Heard Dep. at 97-98.)

Following Plaintiff's acceptance of the position, Waynesburg issued a press release on its web site, complete with his picture, entitled "All-American Charlie Heard Hired as New Head Wrestling Coach." (Heard Dep. at 92-93 & Ex. 9.) As part of his employment with Waynesburg, Plaintiff signed an Anti-Discrimination/Anti-Harassment Policy Verification Statement. (Heard Dep. at 93 & Ex. 10.)

During his employment with Waynesburg as part-time head wrestling coach, Plaintiff did

2

not apply for any other positions with the University. (Heard Dep. at 194.) On April 23, 2007, Waynesburg renewed its agreement with Plaintiff for a second year and increased his salary to $10,000.00 and his recruiting budget from $3,000.00 to $4,000.00. (Heard Dep. at 91, 191 & Ex. 8.)

During Plaintiff's second season, on January 28, 2008, he was overseeing the wrestling team's open room practice and its live drilling when an incident occurred. Z.B.,[2] an 18-year old freshman, performed a wrestling move during live drills that Plaintiff thought was "comical," so he stated "make sure you don't do that in a match, because it ain't going to work." Although Plaintiff thought that the wrestlers were kidding around, Z.B. jumped up from the mat and walked quickly toward him "in a raging manner, swearing and a mean look on his face." When Z.B. got close to him, Plaintiff "didn't know what he was going to do" so to protect himself he raised his hand and struck Z.B.'s lip with the front part of his closed hand. (Heard Dep. at 199-204.) Z.B. then left the room and returned holding a cell phone which he handed to Plaintiff, saying "My dad wants to speak with you." Plaintiff recounted what happened to Z.B.'s father, who told him he "should have been a better example" for his son. He also stated that he would contact the school regarding the incident and Plaintiff told him "You do what you have to do." (Heard Dep. at 204-11.)

Plaintiff approached a Waynesburg security officer and asked her what he should do. She advised him to wait and speak with Michael Humiston, Waynesburg's Director of Public Safety.

---

[2] Waynesburg refers to the student-athlete by his initials to protect his privacy. Plaintiff does not do so. The Court will follow Waynesburg's practice and refer to him as "Z.B."

(Heard Dep. at 214; Humiston Dep. at 4.[3]) The following day, January 29, 2008, Plaintiff met with Humiston and discussed the incident. Humiston asked Plaintiff to prepare a written version of the incident, but Plaintiff responded that he would prefer to go home and think about the event before preparing a statement and Humiston permitted him to do so. (Heard Dep. at 214-16.)

That same day, Plaintiff received a telephone call from Assistant Athletic Director Rick Shepas, advising him that he was suspended until further notice due to the incident with Z.B. Shepas also requested that Plaintiff provide a written statement regarding the incident. (Heard Dep. at 216; Noftzger Dep. at 16.[4]) The following day, Humiston called Plaintiff and left a message, again requesting that he provide a written statement. Plaintiff did not return the call, but instead visited with an attorney. (Heard Dep. at 216-17.) Plaintiff also received a call from Thomas Helmick, Waynesburg's Human Resources and Student Services Disability Coordinator, again requesting that he provide a written statement. (Heard Dep. at 217; Helmick Dep. at 4.[5])

Plaintiff prepared a written statement on January 30, 2008. The statement provides in part: "As [Z.B.] came closer to me in a rage with the angry look of intention on his face, my first reflex reaction was to back the 285 pound man off me before he harmed me. Finding myself in this dangerous position, my first quick reflex was to back him off, and the immediate reflex was a punch toward him to back him off from the attack on me." (Heard Dep. at 218-19 & Ex. 26.)

On January 31, 2008, Plaintiff met with Noftzger and Helmick in Helmick's office regarding the incident. At the meeting, Noftzger reviewed Plaintiff's written statement, remarked that it was not materially different from the report prepared by Waynesburg's Director

---

[3]    ECF No. 43 Tab B.
[4]    ECF No. 51 Ex. E.

4

of Public Safety and then handed Plaintiff a letter terminating his employment with Waynesburg effective January 31, 2008. (Heard Dep. at 220-21 & Ex. 28.) The decision to terminate Plaintiff's employment was made by Helmick and Noftzger. (Helmick Aff. ¶¶ 3-6.)[6]

Helmick states that, in making this decision, he and Noftzger considered Z.B.'s written statement, a security report prepared by Waynesburg's Director of Public Safety, the statements of other Waynesburg students, student-athletes and employees who were present at wrestling practice on January 28, 2008, the complaint made by Z.B.'s mother, and Plaintiff's written statement. (Helmick Aff. ¶ 8.) Defendant states that, other than Plaintiff, there has never been an instance in which a student and/or parent complained to Waynesburg that a coach physically struck a student-athlete during practice. (Patterson Dep. at 28.)[7]

Procedural History

Plaintiff filed this action on September 28, 2009. Count I alleges that Defendant discriminated against him because of his race and because of his attempts to recruit African American students, and that it fired or constructively discharged him in retaliation for his opposition to racial discrimination, in violation of § 1981. Count II alleges that Defendant discriminated against him on the basis of his race and treated him differently than other coaches with respect to the amount of pay he received, and that it fired or constructively discharged him because of his race, in violation of Title VII. Count III alleges that Defendant discriminated against him based on his race and created a racially hostile work environment, in violation of the PHRA.

---

[5] ECF No. 43 Tab C.
[6] ECF No. 45.

On September 15, 2010, a motion for summary judgment was filed by the Defendant (ECF No. 42).

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Title VII/§ 1981/PHRA Racial Discrimination Claims

Title VII provides that it is an unlawful employment practice for an employer to discriminate against an individual with respect to conditions of employment because of his race. 42 U.S.C. § 2000e-2(a). Discrimination on the basis of race is also prohibited by § 1981 and the

---

[7] ECF No. 43 Tab E.

PHRA. 42 U.S.C. § 1981; 43 P.S. § 955. In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 53 (1981). Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278-79 (3d Cir. 2000).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. Id. at 804. The Court of Appeals for the Third Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). Cases under § 1981 and the PHRA follow this same analysis. See Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (§ 1981); Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 469 (3d Cir.

2001) (PHRA).

Defendant argues that: 1) Plaintiff cannot state a prima facie case of racial discrimination with respect to his termination because he cannot point to a similarly situated individual who received more favorable treatment; and 2) even if he could establish a prima facie case, it has proffered a legitimate, non-discriminatory reason for his termination (namely, the incident in which he struck Z.B.) and he has not produced evidence from which the trier of fact could conclude that the reason is a pretext for unlawful racial discrimination.

Plaintiff responds that: 1) the trier of fact could conclude that the entire history of his employment with Waynesburg, including the file kept on him by Marisa and his confrontation with Noftzger a week before the incident with Z.B., supports the inference that racial discrimination was the reason for his termination and/or that there were procedural constitutional violations in the investigation and firing; and 2) Defendant has not addressed his other claims, including the claims that he was paid less than similarly situated white coaches, incidents that created a hostile working environment, a history of discriminatory comments made to his African-American student athletes from Georgia and the claims of retaliation.

Defendant argues that Plaintiff cannot state a prima facie case of racial discrimination because he cannot point to another similarly situated individual, that is a coach who struck a student athlete, who received more favorable treatment than he did. However, as the Court of Appeals has clarified, although some previous cases had created confusion by referring to favorable treatment outside the protected group as a prima facie case element, "[u]nder McDonnell Douglas, evidence of favorable treatment outside the protected class is not an element of a prima facie case." Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933,

939 (3d Cir. 1997) (citing McDonnell Douglas, 411 U.S. at 802). See also Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1997) (evidence that a non-member of the protected class was treated more favorably is enough for purposes of the prima facie case and the issue of whether the individual is "similarly situated" is more appropriately addressed at the pretext stage of the analysis). Thus, Plaintiff need not point to a white coach who struck a student athlete at Waynesburg but was not terminated in order to state a prima facie case of racial discrimination.[8]

Moreover, by way of this argument, Defendant is attempting to force Plaintiff to prove that he was discriminated against in order to state a prima facie case. In other words, Defendant has referenced its proffered reason for Plaintiff's termination in the course of articulating why he cannot state a prima facie case of discrimination. To require Plaintiff to rebut this reason in order to establish a prima facie case of discrimination improperly imports into the prima facie analysis the later stages of the McDonnell Douglas test.

As cogently explained by the Sixth Circuit:

a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

Wexler v. White's Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003) (en banc) (citing Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2000)). See also Thomas v. Denny's, Inc., 111 F.3d 1506, 1510 (10th Cir. 1997) ("relying on a defendant's reasons for the

---

[8] Similarly, Defendant cannot rely on the fact that, in his response to its Statement of Undisputed Material Facts, Plaintiff refused to admit or deny that his employment was terminated because he struck Z.B. (ECF No. 52 at 2) (citing ECF No. 50 ¶ 44.) This is not a fact, but the ultimate issue to be decided in the case.

adverse employment action as a basis for ruling against a plaintiff at the prima facie stage raises serious problems under the McDonnell Douglas framework because it frustrates a plaintiff's ability to establish that the defendant's reasons were pretextual."); Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 944 (8th Cir. 1994) ("by requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment action–in other words, to prove pretext and the ultimate issue of intentional discrimination. The prima facie case is not so onerous.")

Thus, Plaintiff has stated a prima facie case of racial discrimination. Nevertheless, Defendant has pointed to a legitimate, non-discriminatory reason for Plaintiff's termination, namely the incident in which he struck Z.B. Waynesburg explains that it investigated this incident and concluded that it presented sufficient cause for Plaintiff's dismissal. It has thus satisfied its relatively light burden of production. Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

The burden then shifts back to Plaintiff to proffer evidence from which the trier of fact could conclude that Defendant's reason is a pretext for unlawful racial discrimination. However, the "issue is whether discriminatory animus motivated [the decision], not whether [Waynesburg] is wise, shrewd, prudent or competent." Fuentes, 32 F.3d at 765. Thus, Plaintiff's own subjective feelings that the decision was incorrect are insufficient to demonstrate pretext.

In his brief, Plaintiff refers to the fact that there were 15 to 20 other individuals in the room at the time of the incident, including some African-American wrestlers, and then states that: "It is anticipated that African-American workers at trial will support Mr. Heard's deposition

testimony as to discrimination." (ECF No. 49 at 4.) Plaintiff misunderstands the nature of summary judgment. It is his responsibility to proffer the testimony of any witnesses now in order to demonstrate the existence of a genuine issue of material fact regarding the reason for his termination. Hypothesizing what witnesses may say at trial is insufficient. "At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000) (citation omitted).

Moreover, Plaintiff's own version of the incident states that he "punched" Z.B. Although Plaintiff indicates that he did so "as a reflex" and in "self defense" when Z.B. "attacked" him, he admits that Z.B. did not strike him but instead approached him in a "raging" manner and using profanity. Waynesburg has stated that it considered Plaintiff's version of events, and he has not proffered any evidence to indicate that it did not do so. In addition, despite his vague and irrelevant references to due process (this case concerns racial discrimination, not due process),[9] it is clear that Waynesburg afforded him an opportunity to present his version of events, but it concluded that terminating his employment because of this incident was appropriate under the circumstances. Whether that decision was wise, shrewd or prudent is irrelevant; the question is whether it is a pretext for unlawful racial discrimination.

Finally, Plaintiff points to the history of events that preceded the incident to demonstrate that Defendant's reason was merely "a sham" to cover up a termination that had long been

---

[9]   Waynesburg asserts—and Plaintiff has not disputed—that it is "a private, comprehensive Christian university offering doctoral, graduate, and undergraduate degrees to approximately 2,500 students annually." (ECF No. 44 at 1.) Because it is a private school, it is not a "state actor" and is not required to offer "due process" to its staff.

planned. In particular, he argues that an incident that occurred a week before provides evidence that Noftzger was "lying in wait" for an excuse to fire him.

Defendant responds that, by Plaintiff's own admission, the incident that occurred a week before the Z.B. incident involved Noftzger "chastising Mr. Heard for his handling of the wrestling program." (ECF No. 49 at 4.) Thus, it contends, Plaintiff offers no support for his contention that the incident with Noftzger demonstrates that his termination a week later following the incident in which he struck Z.B. was a pretext for unlawful racial discrimination.

Plaintiff contends that Marisa "kept a file on him," that Marisa subjected him to "racial slurs" and that he was subjected to "numerous adverse employment actions" although he does not identify what they are. Defendant argues that the evidence does not support any of these assertions.

First, Plaintiff contends that Marisa used racial slurs and particularly cites his use of the term "boys." But Defendant notes that, in support of this claim, Plaintiff cites only pages 151-52 of his own deposition, at which point he was testifying that the word "boys," if applied to grown African-American men, has a racially charged meaning. Defendant is correct that Plaintiff never accused Marisa of using the word "boys" at his deposition, or at least the portion of it that is in the record. However, Richard Noftzger was asked at his deposition if he ever heard Marisa refer to three African-American recruits from Georgia as "boys" and he said yes and that Plaintiff found this offensive. (Noftzger Dep. at 87-88.)

Nevertheless, Noftzger also stated that "I heard Rudy Marisa refer to about everybody as boys." (Noftzger Dep. at 87.) Moreover, this testimony does not demonstrate that Marisa used the term "boy" to refer to Plaintiff or that Marisa otherwise subjected <u>him</u> to racial slurs.

Second, Defendant correctly notes that, despite the comment about "numerous adverse employment actions," Plaintiff cites only the termination and his rate of pay, which is discussed below. Therefore, the record simply does not support this contention.

With respect to the claim concerning the amount of pay he received, Defendant argues that: 1) the position was advertized as being part-time before Plaintiff applied for it and he pursued it and accepted it knowing the rate of pay would be $7,500.00; 2) he proffers no evidence that this rate of pay was not equivalent to that given to other similarly situated part-time coaches at Waynesburg; 3) he argues that other coaches were given the opportunity to supplement their pay with additional jobs, but he admits that he never applied for any additional jobs; and 4) his claim that coaches at other schools received a higher rate of pay is irrelevant.

The advertisement stated that the position was part-time. (Heard Dep. Ex. 1.) Plaintiff has admitted that, during his interview, Marisa told him that the rate of pay would be $7,500.00. (Heard Dep. at 77-78.) Although there was some discussion about what might happen in the future, he accepted the position and signed a contract such that he knew he would be receiving $7,500.00 in the first year. (Heard Dep. at 88-90 & Ex. 7.) The following year, Waynesburg renewed his contract and increased his pay to $10,000.00. (Heard Dep. at 91 & Ex. 8.)

Although Plaintiff contends that other coaches were allowed to supplement their income by obtaining other jobs at the University, he admitted that he never applied for any other positions. (Heard Dep. at 194.) Noftzger testified that some of the other part-time coaches had other jobs at Waynesburg, but others did not. Moreover, Noftzger testified that Plaintiff, just like every other part-time coach, asked him if the position could be made full-time, and he told him that there was no reason to expect that to happen. (Noftzger Dep. at 33-36.) And Defendant

13

correctly notes that the rate of pay other coaches may have received at other schools (Heard Dep. at 170)[10] is irrelevant. Thus, Plaintiff has not supported his claim that the pay rate he received was a form of racial discrimination.

Finally, Defendant argues that the record does not support Plaintiff's claim that Marisa "kept a file on him," noting that Marisa's deposition testimony at page 66 (as cited by Plaintiff) says nothing about it. However, Plaintiff has submitted into the record a series of documents that could be described as a file that Marisa kept on him, which detailed numerous incidents that occurred during his employment with Waynesburg. The incidents include the following: 1) he and Marisa had had 12 to 14 meetings over the first 5 months of his employment to discuss various areas of concern; 2) on September 7, 2006, he ordered Marisa out of the wrestling room saying he did not know the rules, which Marisa interpreted as "insubordination" 3) Plaintiff was not returning the wrestling mats he moved to the armory and had not arranged for Marisa to speak to the team; 4) he was not allowing the assistant wrestling coach to meet with Marisa as directed, so Marisa let the assistant go; 5) he called Marisa "stupid" and screamed "get that woman away from me" when the assistant athletic director came into the room; 6) he told Marisa and Noftzger on October 9, 2006 that he doesn't answer to them, only to God; 7) he was including his own personal expenses and his family's meals in requests for reimbursement, which was improper; and 8) he sent a letter to Waynesburg alumni on March 13, 2007, in which he asked that they provide funding to make his position full-time, but this was inappropriate without the consultation of Marisa and Noftzger. (ECF No. 51 Ex. C.) See also Marisa Dep. at

---

[10] ECF No. 51 Ex. F.

14

23[11] (Plaintiff told Marisa he was not going to have his assistant meet with him); id. at 33-35 (Plaintiff was insubordinate by ordering him out of the wrestling room and calling him stupid); Noftzger Dep. at 62 (Plaintiff inappropriately solicited alumni for funds to make his position full-time).

Nevertheless, consideration of this evidence does not alter the result that Plaintiff has failed to present evidence of pretext. First, he does not dispute that the incidents chronicled in this file actually occurred. Second, the fact that Marisa kept this information does not in any way suggest that he was discriminating against Plaintiff based on his race. Rather, it would appear that Plaintiff demonstrated numerous times that he was refusing to follow the rules of the University and the NCAA and that he was being disrespectful and rude to Marisa, Noftzger and the assistant athletic director. And finally, even if the file suggested that Marisa was "lying in wait" to find an excuse to get rid of him, his termination was not the result of a charge that Marisa "trumped up" against him. Rather, the undisputed fact remains that Plaintiff struck a student-athlete (something that had never happened before at Waynesburg), and that the University (that is, Helmick and Noftzger, and not Marisa) investigated the incident and concluded that he should be terminated. Thus, even if this evidence suggested that Marisa was predisposed to terminate Plaintiff's employment (and it does not), it would not advance Plaintiff's case because the decision to terminate his employment was made by Noftzger and Helmick, as he has admitted. (ECF No. 50 ¶ 42.)

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

---

[11] ECF No. 51 Ex. D.

15

a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." Fuentes 32 F.3d at 765. Therefore, with respect to Plaintiff's racial discrimination claims, the motion for summary judgment will be granted.

### Hostile Work Environment

Plaintiff also alleges that Waynesburg subjected him to a racially hostile work environment. Although Defendant refers to this claim as "newly argued" (ECF No. 52 at 5), the complaint did allege a hostile work environment claim, at least under the PHRA in Count III.

The Supreme Court has held that a plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working environment. Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). The Court of Appeals has held that:

> Five constituents must converge to bring a successful claim for a sexually hostile work environment under Title VII: (1) the employee suffered intentional discrimination because of their sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability.

Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)). The same standards apply to a racially hostile work environment. See Faragher, 524 U.S. at 786-87 & n.1; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996).

Defendant argues that Plaintiff has produced no evidence that: 1) Marisa's supervisory style was influenced by any discriminatory animus; 2) he suffered harassment that was "severe" or "pervasive"; or 3) he was supervised more closely or subject to any inconsistent rules as

16

compared to white part-time head coaches supervised by Marisa. The Court agrees. In particular, Plaintiff cites no incidents of discrimination that would meet the standard of being severe or pervasive.

The Supreme Court has stated that: "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Plaintiff has cited no specific incidents of discrimination, other than his termination and his allegation that Marisa "kept a file on him." However, this is insufficient. See Trujillo v. University of Colo. Health Sciences Ctr., 157 F.3d 1211, 1214 (10th Cir. 1998) (fact that supervisor documented improprieties in his job performance did not support plaintiff's claim for racially hostile work environment). Therefore, he cannot maintain a hostile work environment claim and, with respect to it, Defendant's motion for summary judgment will be granted

Retaliation Claims

Under Title VII, it is an unlawful employment practice to discriminate against any employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The same is true under the PHRA. 43 P.S. § 955(d). The Supreme Court recently confirmed that § 1981 covers retaliation claims. CBOCS West, Inc., v. Humphries, 553 U.S. 442 (2008). Claims brought under § 1981 and the PHRA are analyzed under the same standards as claims

under Title VII. See Bryant v. Jones, 575 F.3d 1281, 1307 (11th Cir. 2009), cert. denied, 130 S.Ct. 1536 (2010) (§ 1981); Slagle v. County of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006) (PHRA).

As summarized by the Court of Appeals for the Third Circuit, the prima facie case elements for a retaliation claim are as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006).Defendant argues that Plaintiff has failed to adduce sufficient evidence that it retaliated against him on the basis of any "protected conduct" because he has not even identified any protected conduct he engaged in. Moreover, it argues that it has proffered a legitimate, non-discriminatory reason for his termination and he has not proffered evidence from which the trier of fact could conclude that this reason is a pretext for unlawful retaliation discrimination.

The Court of Appeals has held that, while an employee's informal complaints to the employer of "specific discriminatory conduct" may constitute protected activity, "general complaints of unfair treatment" do not. Barber v. CSX Distr. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995). In Barber, the plaintiff contended that the employer retaliated against him for complaining about age discrimination, but the alleged protected activity consisted of a letter expressing dissatisfaction that a promotion went to another employee; the letter referred to Barber's many years of experience and the other employee being "less qualified," but made no

18

reference to age. The Court of Appeals held that:

> Barber's letter is just too vague to support a finding that his job was eliminated because he engaged in behavior that was protected under the ADEA. A person has engaged in "protected conduct" when s/he "has opposed any practice made unlawful by ... section [623]." 29 U.S.C. § 623(d). The practice made unlawful by § 623 is "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such an individual's age." 29 U.S.C. § 623(a). Thus, the statute provides that a person has engaged in "protected conduct" when s/he opposes discrimination on the basis of age. It is clear from Barber's letter that he felt that he had been treated unfairly as he stated that "the position was awarded to a less qualified individual." However, that letter does not explicitly or implicitly allege that age was the reason for the alleged unfairness. A general complaint of unfair treatment does not translate into a charge of illegal age discrimination. The jury was not presented with any evidence to support its conclusion that Barber's position was eliminated because he engaged in protected activity. Accordingly, the district court properly granted the defendants' motion for judgment as a matter of law on that portion of Barber's claim.

Id. at 702. See also Slagle v. County of Clarion, 435 F.3d 262, 266-68 (3d Cir. 2006) (employee who made only a general complaint of unfair treatment could not rely upon that complaint as "protected activity" for purposes of Title VII's retaliation provision).

Plaintiff has not even cited any protected activity that he engaged in. Therefore, he has not stated a prima facie case of retaliation discrimination. Moreover, as discussed above, Defendant has pointed to a legitimate, non-discriminatory reason for terminating his employment, namely the incident in which he struck Z.B., and Plaintiff has not presented evidence that this reason is a pretext for unlawful retaliation discrimination. Therefore, with respect to this claim, Defendant's motion for summary judgment will be granted.

Based on the foregoing, the motion for summary judgment filed by Defendant, The Waynesburg University f/k/a The Waynesburg College, shall be granted. An appropriate order will follow.

19